[No. 1896]

# LYON COUNTY, RESPONDENT, *v.* STOREY COUNTY, APPELLANT.

1. TAXATION—BOUNDARIES—EVIDENCE.

   In an action by one county against another county for taxes collected by defendant county on property claimed to be in plaintiff county, evidence *held* to sustain a finding for plaintiff.

2. COUNTIES—BOUNDARIES—STATUTE—DIRECTORY PROVISIONS.

   Stats. 1866, c. 47, sec. 1, which authorized the survey and establishment of boundaries between the several counties, and required the survey to be commenced within six months after the passage of the act, was directory, especially in view of section 7, permitting such surveys to be made when a county line is now or may "hereafter" be in dispute.

3. BOUNDARIES—CONTROL OF NATURAL MONUMENTS.

   Natural monuments control directions.

APPEAL from the First Judicial District Court of the State of Nevada, in and for Ormsby County; *George S. Brown*, Presiding Judge.

Action by Lyon County against Storey County. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. **Affirmed.**

## STATEMENT OF FACTS

This is an action brought by Lyon County against Storey County to recover an amount of taxes levied and collected by Storey County upon certain property alleged to be within the boundaries of said Lyon County. The sole question involved in the case was the proper location of the east boundary line of Storey County. By an act of the territorial legislature of November 25, 1861, entitled "An act to create counties and establish the boundaries thereof," the counties of Esmeralda, Douglas, Ormsby, Washoe, Lyon, Storey, Lake, Humboldt, and Churchill were created. Sections 5, 6 and 9 of said act read as follows:

"SEC. 5.    There shall be a county, to be known as Lyon County, to include all that part of the territory within the boundaries described as follows: Beginning at the southeast corner of Washoe County; thence following the north line of Ormsby County in a southeasterly direction,

to the Half Way House, between Silver City and Carson City; thence, following the said line of Ormsby County to Douglas County; thence, following the northerly boundary of Douglas County to the one hundred and nineteenth meridian of west longitude; thence, north, five miles; thence, by direct line, northwesterly, to a point on Carson River, one mile below Reed's Station; thence, north, three miles; thence, westerly by a direct line, to the southern boundary of the Gold Hill mining district, but running so as to include in this county the Devil's Gate Toll House; thence, continuing westerly in the same course, to the eastern boundary of Washoe County, and thence, southerly, along the eastern boundary of said county, to the place of beginning.

"SEC. 6.    There shall be a county, to be known as Storey County, to include all that part of the territory within the boundaries described, as follows:  Beginning at the northwestern corner of Lyon County, and running thence, in an easterly direction along the northern boundary of Lyon County, to the northeastern corner thereof; thence, north, in a straight line, to the road leading from the lower crossing of the Truckee to the sink of the Humboldt; thence, westerly, along said road to the Truckee River; thence, up the middle of said river, to the eastern line of Washoe County; thence, southerly, along said line, to the place of beginning."

"SEC. 9.    There shall be a county, to be known as Churchill County, to include all that part of the territory within the boundaries described as follows:  Beginning at the northeast corner of Storey County, and running south, along the eastern line of said county, to the northern line of Douglas County; thence, easterly, along the said northern line of Douglas County, and the northern line of Esmeralda County, to the one hundred and sixteenth meridian; thence, north, along said meridian, to the fortieth degree of north latitude; thence, west, on the said fortieth degree, to where it strikes the old immigrant road leading from the sink of the Humboldt to the lower crossing of Truckee River; thence,

westerly, along said road, to the point of beginning."
(Stats. 1861, pp. 50–52.)

By an act of the territorial legislature approved February 19, 1864, entitled "An act to organize the county of Churchill and for other purposes," it was provided in section 1 as follows:

"SECTION 1.    The county of Churchill is, with its western boundary, fixed on the line of longitude forty-one degrees forty minutes west, as established by De Groot's map of Nevada Territory, published in A. D. eighteen hundred and sixty-three, and with its other boundaries as established by law, is hereby organized into a distinct county, with all the rights, privileges and immunities thereunto belonging." (Stats. 1864, p. 86.)

By an act of the same legislature approved February 20, 1864, entitled "An act changing the boundary lines of Lyon County and for other purposes," it was provided:

"SECTION 1.    That the eastern boundary line of Lyon County be and is hereby changed from the present boundary as established by law, to the line of longitude forty-one degrees, forty minutes, west from Washington, as laid down on De Groot's map of Nevada Territory, published A. D. eighteen hundred and sixty-three.

"SEC. 2.    All other boundaries of Lyon County, affected by the change of the eastern boundary, shall follow the lines of that portion of Churchill County ceded to Lyon, as established by law."    (Stats. 1864, p. 148.)

Section 9 of the act of 1861, *supra*, in regard to the boundary of Churchill County, was amended by an act of the legislature of the State of Nevada approved February 27, 1869 (Stats. 1869, p. 88), but as such amendment is not material to questions involved in this case it will not be repeated.

By an act of the legislature approved March 6, 1899, entitled "An act to definitely fix and establish the boundaries of Lyon County," it is provided:

"The territory over which Lyon County has exercised jurisdiction for the period of five years last past, in the assessment and collection of taxes, in the selection of

grand and petit jurors, in the establishment of voting precincts and the holding of elections therein, is hereby declared to be within the boundary of that county." (Stats. 1899, p. 41.)

By reference to sections 5 and 6, *supra*, of the act of 1861, it will be noted that the northeast corner of Lyon County and the southeast corner of Storey County, as established by the said act of 1861, was a common point. This point is described in section 5 as being three miles north of a point on Carson River "one mile below Reed's Station." The boundaries of Storey County have never been changed since the passage of the act of 1861, *supra*. By the changes made in the west boundary line of Churchill County, a strip of land between the west boundary of Churchill County and the east boundary of Storey County was ceded to Lyon County, so that the east boundary line of Storey County now forms a part of the west boundary line of Lyon County. The assessed property in controversy is claimed by Lyon County to be within this strip formerly within the boundaries of Churchill County as fixed by an act of 1861. Judgment was rendered in favor of Lyon County, and from the judgment, and from an order denying a motion for new trial, Storey County has appealed.

*Geo. N. Noel,* District Attorney of Storey County, and *W. E. F. Deal,* for Appellant:

The three counties of Lyon, Storey and Churchill are laid down exactly according to the descriptions in the statute of 1861, on the De Groot map of 1863.

These things being so, the Reed Station claimed by Lyon County, eight miles below Dayton, cannot be the Reed Station intended by the statute, and the Reed Station as claimed by Storey County at a point north three miles from a point on Carson River, one mile below Reed's Station, is the station intended by the act of 1861, at or near the northeast corner of Lyon County, as laid down on De Groot's map.

It may be claimed, as it was claimed in the district

court, that the boundary lines of Lyon County were so changed by legislative enactments, subsequent to 1863, that the property upon which the taxes in question were collected by Storey County was included by an addition made to Lyon County. This cannot be so, because the land upon which the taxes were collected is within the boundaries of Storey County, as established by the act of 1861, and these have never been changed, and within land embraced in Storey County, as laid down on De Groot's map of 1863.

The state, by its legislature and chief executive and by means of an act, has the sole power to make and change boundaries of counties. (11 Cyc. 346–347.)

The act of 1861 fixed the boundaries of all the counties in the territory at that time, and in determining those boundaries the whole act must be taken together, as it was the intent of the legislature to determine them with reasonable certainty.

The same rules of construction apply to the description of the boundaries of the different counties, as provided in the act of 1861, as would be applied to a deed between private individuals. (Tyler, Law of Boundaries, p. 133.)

As to courses, the intent of the legislature must govern, and that intent must be derived from the whole statute, and, independently of a showing to the contrary, courses are to be run as called for by the description in the act. (11 Cyc. 349; 5 Cyc. 85, and authorities cited.)

The boundary lines between the two counties were not established by the survey of Mr. Mack, by virtue of the provisions of the act of the legislature of the State of Nevada, approved February 26, 1866. (Stats. 1866, pp. 130, 131.)

That act was intended as a temporary act, the first section requiring the survey authorized to be commenced within six months after the passage of the act. This was a limitation fixed by the legislature, and was not a mere permissory authorization to be exercised at any time, but a limitation after which no survey could be made under that act.

The act did not authorize the boundary lines of counties to be changed by any surveyor, or by any board of county commissioners, or any members of boards acting jointly.

There must be read into this act the description of the boundary lines, as provided by the legislature, and those lines must be followed, otherwise the survey is of no force whatever.

The act, if of any force whatever, at the time of Mr. Mack's survey was an authority to him to survey the boundaries as established by law, and not an authority to violate the law or make a survey contrary to the boundaries as established by the legislature.

The district court erred in permitting a map to be introduced and used in evidence against the objections of Storey County. The map had on it the name of George Hunt, and a certified copy of field notes of the record of a survey purporting to have been made by George Hunt was also introduced, but, without proof of the correctness of this survey, it was of no force, as the certified copy is not legal evidence of that fact.

The field notes do not agree with the description of the boundary lines of Lyon County set forth in the survey, nor is the line laid down on the map a boundary between the two counties as established by any statute of the State of Nevada.

This map tended to mislead the jury, and did not tend to establish the issues made by the pleadings, and the line laid down on it was not in accordance with the field notes of any official survey.

The parties to a suit are entitled to have the law applicable to any supposed hypothesis of fact, of which there is legal evidence given to the jury, and may apply the law to the facts. (*Clark* v. *McElvy,* 11 Cal. 161; *People* v. *Taylor,* 36 Cal. 264; *People* v. *Hecker,* 109 Cal. 460.)

So far as the laws of Nevada in question here are concerned, fixing boundaries, changing them and with reference to surveys, the jury were, to use the illustration from the last case above cited, "left without rudder or compass."

The verdict is not supported by the evidence, but is against the great preponderance of the evidence.

It was shown by the evidence that the boundaries of these two counties were originally fixed by the act of 1861; that no change has ever been made in the boundaries of Storey County as fixed by that act; that by the act of 1861 the southern boundary of Storey County is the northern boundary of Lyon County, as fixed by the same act; that no change has ever been made in the boundaries of Lyon County which affect any part of Storey County.

The boundaries of the two counties are so described as to enable a competent surveyor to survey and establish them as they were fixed by the act of 1861 from the descriptions in the statute.

Within two years after the act of 1861 a map of Nevada Territory was published, that of De Groot in evidence, upon which the boundaries of Storey and Lyon County are laid down as fixed by the statutes of 1861, and as they are claimed by Storey County.

This map is an authentic map, and made official by two acts of the legislature of 1864, and, in connection with the statute of 1861 and the other evidence, warranted a verdict in favor of Storey County.

The acts of 1864 are plain in their terms and affect in no way the boundaries of Storey County as fixed by the act of 1861.

The attempt to establish this boundary by surveys must fail, because those surveys on their face are not supported by any law, but are in clear violation of the plain calls of the acts of the legislature, and of every principle of law with reference to the construction of descriptions of boundaries.  The course run by Mr. Mack from a point three miles north of a point on Carson River one mile below the Reed's Station, testified to by the witnesses for Lyon County, to the northeast corner of Storey County would leave out about one-half of Lyon County as laid down on De Groot's map.

The copy of the map from the United States surveyor-

general's office in evidence is against the contention of Lyon County.

*Chas. H. Miller,* District Attorney of Lyon County, and *Mack & Green,* for Respondent:

At the outset of his argument counsel for appellant boldly declares that the boundary lines of Storey County, as established by the act of 1861 (Stats. 1861, p. 52), have never been changed by any subsequent act of the legislature.

We take it, then, that counsel is ready and willing to to accept that statute as correctly defining the corners and boundaries of Storey County; but, before we proceed further into the various aspects of the case, we wish to impress upon the minds of the court that the result of this controversy does not, nor never did, hinge upon the fact as to whether or not there were any changes in the boundary lines of Storey County as established by the statutes of 1861.

By reference to the various statutes creating the several counties of the state and establishing and fixing the boundaries thereof, and the evidence adduced at the trial of this action, it is clearly proven that Lyon County has, and is legally entitled to, the absolute dominion over the disputed territory, and that no part of the same is, nor never was, within the confines of Storey County.

If the boundaries of Storey County have never been changed, then the southeast corner of Storey County remains just where it was established by the legislature in 1861, and which said southeast corner of Storey County at that time was the same, and identical with the northeast corner of Lyon County, viz: "at a point three miles north of a point on Carson River, one mile below Reed's Station." (Stats. 1861, pp. 51, 52, secs. 5, 6.)

By not only a preponderance of evidence, but with little or no evidence to the contrary, it was proven at the trial that Reed's Station, as designated by the legislature, is the Reed's Station seven or eight miles below the town

of Dayton, and not a so-called Reed's Station forty miles east of Virginia City, as contended by the appellant.

Storey County at the trial made a desperate endeavor to establish the identity and location of a "Reed's Station" favorable to its contention, and in that behalf produced four witnesses, but only one of them would dare venture a statement under oath that he had seen or known of a place kept by a Reed "thirty or forty miles east of Virginia City" prior to 1863, or two years after the passage of the act of the legislature.

The report of the survey made by Mr. Hunt in 1869 clearly proves the "Reed's Station" seven or eight miles below Dayton to be the one contemplated by the statutes of 1861, and was so recognized by the appellant as well as by the respondent, and by the citizens, inhabitants, and public authorities of both for more than forty years.

"Reed's Station" being the permanent object, or monument, designated by the legislature, then it necessarily follows that the southeast corner of Storey, which at that time was the northeast corner of Lyon County, is at a point three miles north of a point on Carson River, one mile below said Reed's Station, which Reed's Station is seven or eight miles below Dayton, as proven at the trial; and it was also proven at the trial that Storey County had for more than forty years recognized, acquiesced in, and accepted that point as its southeast corner.

It is well settled in this country that, "where the public authorities for a long series of years have recognized a certain line as the boundary between their respective counties, public policy forbids that such line shall be changed, even though such line was not the one intended." (*Edwards County* v. *White County*, 85 Ill. 390; *Hecker* v. *Sterling*, 86 Pa. 423; *Hamilton* v. *McNeill*, 13 Grat. 389.)

County lines are subject to the general rule that "long acquiescence of the parties should have controlling weight." (*Roane County* v. *Anderson County*, 89 Tenn. 259, 14 S. W. 1079.)

The northeast corner of Storey County, at or near the

"lower crossing of the Truckee," was by the act of 1861 made the same as, and identical with, the northwest corner of Churchill County. (Stats. 1861, sec. 9, p. 52.) Therefore the western boundary of Churchill County was the eastern boundary of Storey County, and the territory now in dispute was in Churchill County at that time.

Appellant, by its statement on motion for new trial, asserts its right to the disputed territory on the ground that by the acts fixing the western boundary line of Churchill County forty-one degrees forty minutes west from Washington, as laid down by De Groot's map, and fixing the eastern boundary of Lyon County on the same meridian, "the northern boundary of Lyon County was not changed, nor was any territory originally given to Storey County taken from Storey County by these acts, or by any other act, and added to Lyon County."

It is agreed that "no territory was taken from Storey County and added to Lyon County."

The evidence, both parol and documentary, adduced at the trial proves that the northeast corner of Storey County is, and always was, fixed at or near the "lower crossing of the Truckee River."

It is not only a matter of history, but it is a matter of law as well, that Churchill and Lyon Counties had from 1861 until these statutes were passed in 1864 exercised joint dominion and authority over all the territory embraced within the boundaries prescribed in sections 5 and 9 of the Statutes of 1861.

Section 6 of Stats. 1861, p. 290, reads as follows: "The county of Churchill is attached to the county of Lyon for judicial, county and revenue purposes."

While Churchill County had been created and its boundaries defined by the act of 1861, yet a careful reading of the act passed in 1864 (Stats. 1864, p. 86) discloses the fact that all county business of every kind and nature was done in conjunction with Lyon County and by the officers of Lyon County.

We now arrive at the determination of the intention of the legislature as to disposing of the territory left

vacant by the. removal of Churchill's western bound-
ary to forty-one degrees forty minutes west.   While the
statute is somewhat vague, it is a cardinal principle of
law that "statutes forming new counties are not to be
construed with the same rigor and strictness which is to
be observed in the construction of a grant between indi-
viduals affecting the rights of property, but a more lib-
eral rule should be adopted."   (*Hamilton* v. *McNeill*, 13
Grat. 389.)

The object should be to ascertain the true meaning and
intention of the act of the legislature by considering the
same in connection with all others *in pari materia*, and
with the general policy of the legislature as to effectuate
such intention.

It is argued in appellant's opening brief, and much
stress is laid upon the fact, that De Groot's map, published
in 1863, and the things and matters it represents are cor-
rect, according to the statutes of 1861.

With an equal amount of force and sagacity, counsel
argues that the United States government plat, compiled
in 1890, being taken from surveys made in 1868, 1869 and
1887, is also a correct and verified delineation of the
things and all matters contained therein.

We insist, and we have a legal right to insist, that the
appellant, having elected to adopt the above maps as
being correct for the purpose of supporting its contention,
must be compelled to rely upon their correctness for all
purposes.

The government plat, accepted and used by Mr. Taylor
on his private survey, and on which is marked a "Reed's
Station," does neither directly nor by inference or impli-
cation prove anything pertinent to the issue raised by
the pleadings in this case.   The plat itself was compiled
in the year 1890 from notes of surveys made in 1868,
1869 and 1887.   There is nothing on the face of it to
show in what year that Reed's Station was discovered.
It might have been in 1868 or 1869 or 1887.

It is well settled that "a clause in a statute is direct-
ory when it contains mere words of direction. and no

more." (*R. Cusick's Appeal*, 136 Pa. 459, 20 Atl. 574; Cooley's Constitutional Limitations, 77, 78, and cases cited.) Particularly so when a statute provides that official acts shall be done within a given time. (*People* v. *Murray*, 15 Cal. 221; *Hart* v. *Plum*, 14 Cal. 148; *Hugg* v. *Camden*, 39 N. J. Law, 620; *People* v. *Cook*, 14 Barb. 259, affirmed in 59 Am. Dec. 451.)

It will be observed that there are no negative words employed in the statute which forbid a joint survey to settle boundary disputes between counties after six months from the passage of the act has expired, and no penalty attached for noncompliance with the terms thereof, consequently it was the intention of the legislature that the provisions of said statute are merely directory. (*Odd Fellows Bank* v. *Quillen*, 11 Nev. 109; *Corbett* v. *Bradley*, 7 Nev. 106.)

Statutes, unless mandatory, are regarded as directory when the purpose of their passage is merely to secure regularity in official procedure. (*Hart* v. *Plum*, 14 Cal. 148; *People* v. *Cook*, 14 Barb. 259, 8 N. Y. 67, 59 Am. Dec. 451.)

The failure to obey the directory provisions of the statute does not invalidate the actions of an officer. (*Hart* v. *Plum*, 14 Cal. 148; *Odd Fellows Bank* v. *Quillen*, 11 Nev. 109.)

The act was the authority of Mr. Mack to make the survey when required so to do by the county commissioners.

The essence of the thing to be done under the provisions of the statute is to have the lines of the county run and established when there is a dispute concerning the location of said boundaries, and the officers are at liberty to comply with the terms of the statute in any manner deemed most expedient to attain the desired result.

It is true Mr. Mack did follow the eastern boundary of Storey County, and paid no attention whatever to "Devil's Gate" and "Chinatown" mining districts.

As a matter of good judgment, as an officer, to promote economy and expediency, that was his logical course to

pursue, just as long as he complied with the terms of the statute.

We find no law and know of no reason why he should not be allowed to prove the disputed territory was not in Storey County by fixing the legal location of the eastern boundary of Storey County as by any other method.

Certainly the appellant does not claim the right to collect taxes in territority not within its legal boundaries, and Mr. Mack had just the same legal right to run and define the eastern boundary of Storey County as he had to run or define any other line.

The evidence taken at the trial clearly shows that for forty years it was the general repute that the southeast corner of Storey was at the point three miles north of the point on Carson River, one mile below Reed's Station, seven or eight miles below Dayton, as was also shown that for the same length of time Storey County had recognized it as such.

The purpose of the joint survey was to determine the legal status of the territory in dispute, and we cannot conceive why or where the legal rights of Storey County were in anywise affected by Mr. Mack starting at its theretofore recognized southeast corner and following the calls of the statute to the northwest corner.

Although the lines must, as a rule, conform to the act defining the boundary, yet the letter of an act of the legislature fixing the boundaries must yield to the intention of the legislature. (*Hamilton* v. *McNeill*, 13 Grat. 389; *San Bernardino* v. *Richert*, 87 Cal. 287, 25 Pac. 692.)

It is also the general rule of law relating to boundaries that in all cases those calls most consistent with the intention of the parties will, if practicable, be adopted. (*U. S.* v. *Cameron*, 21 Pac. 177; *Serrano* v. *Rawson*, 47 Cal. 52; *Murray* v. *Hobson*, 13 Pac. 921; *Robinson* v. *Kime*, 70 N. Y. 147; *Buffalo R. Co.* v. *Stigeler*, 61 N. Y. 348; *White* v. *Gay*, 31 Am. Dec. 224.)

In tracing county lines as defined by statutes the general rule applies that monuments and natural objects will

control the course. (*Hollenbeck* v. *Sykes*, 29 Pac. 380; *Ullman* v. *Clark*, 100 Fed. 180; *Garrard* v. *Silver Peak Mines*, 82 Fed. 578; *Doe* v. *Paine*, 15 Am. Dec. 507; *McCoy* v. *Galloway*, 17 Am. Dec. 591.)

An ancient map, when duly authenticated, is admissible to prove a disputed boundary. (*Taylor* v. *McConigle*, 120 Cal. 123, 52 Pac. 159; *Gibson* v. *Poor*, 53 Am. Dec. 216; *Harmer* v. *Morris*, 11 Fed. Cases, No. 6076, affirmed in 7 Pet. 554.)

The matters represented upon said map were verified to be correct by T. P. Mack. (2 Elliott on Evidence, 1225, and cases cited.)

The verdict is amply supported by the evidence and thoroughly accords with the great preponderance of the evidence.

The main issue raised by the pleadings and the evidence was the right of Storey County to collect taxes in any territory east of the boundary running from a point "three miles north of a point on the Carson River, one mile below Reed's Station, to the emigrant road, leading from the sink of the Humboldt to the lower crossing of the Truckee River."

The appellant, as a defense, and with all the acumen and sagacity at its command, made a desperate effort to discover a "Reed's Station" from which a line could be run that would throw the disputed territory within its own confines.

The authorities are now uniform, universal and harmonious that such acquiescence for a period equal to the statute of limitations is sufficient to bar the right of a cause of action or a defense to an action.

By its acquiescence for a period equal to that fixed by the statute of limitations for gaining title by adverse possession, *i. e.*, five years, Storey County is forever estopped from questioning these boundary lines. (2 Herman's Estoppel, 1266, 1274, 1276; 1 Dillon's Mun. Corp. sec. 184; *Rockwell* v. *Adams*, 6 Wend. 468; *Baldwin* v. *Brown*, 16 N.Y. 359; *Hunt* v. *Johnson*, 19 N.Y. 279; *Reed* v. *Farr*, 35 N. Y. 113–116; *Sneed* v. *Osborne*, 25 Cal. 619;

*Columbet* v. *Pacheco*, 48 Cal. 395; *Biggins* v. *Champlin*, 59 Cal. 113; *White* v. *Spreckels*, 75 Cal. 610; *Burris* v. *Fitch*, 76 Cal. 395; *Edwards Co.* v. *White Co.*, 85 Ill. 390–401; *Rhode Island* v. *Massachusetts*, 4 How. 591; *Missouri* v. *Iowa*, 7 How. 660; *Gillespie* v. *Cunningham*, 2 Humph. 19; *State* v. *Glenn*, 18 Nev. 44; *People* v. *Farnham*, 35 Ill. 562; *Brown* v. *Leete*, 6 Saw. 332.)

This rule has been recognized by the Supreme Court of the State of Nevada: "It is claimed that the acquiescence of Humboldt County in the exercise of the right of Lander County to assess the property from the years 1887 to 1893, inclusive, estops the respondent from questioning the boundary lines fixed and determined by the surveyor-general. The claim is undoubtedly a correct statement of the rule and should govern in a proper case." (24 Nev. 473.)

By the Court, NORCROSS J. (after stating the facts as above):

The only controversy in this case grows out of the fact that in the early 60's there were two places known as "Reed's Station" on the Carson River, distant about 27 miles from each other. It is the contention of counsel for Lyon County that the Reed's Station referred to in section 5 of the act of 1861, *supra*, was a Reed's Station located on the Carson River about eight miles easterly from Dayton, and shown to be situated in section 34, township 17 N, range 22 E. The Reed's Station claimed by counsel for Storey County to be the one intended by the act of 1861, *supra*, is situated in section 25, township 19 N, range 26 E. A number of witnesses upon the part of Lyon County testified regarding the location of a Reed's Station on the Carson River, about eight miles east of Dayton, existing in 1861, and prior and subsequent thereto, and it is admitted by counsel for Storey County that there was such a Reed's Station there at that time. Counsel for Storey County offered the testimony of a witness, Wm. H. Hodges, who testified to having been at a Reed's Station, about forty miles east of Virginia City on the Carson River in 1861, and other wit-

nesses testified to having been at such station from 1862 to 1864.

Counsel for Lyon County, in rebuttal, offered the testimony of Mrs. L. D. Huntsman, who testified that she lived at Cottonwood Station from 1861 to 1868, and that the Reed who established the Reed's Station, claimed by Storey County, did not come there until about the year 1864 or 1865. Cottonwood Station is shown, upon a map filed as an exhibit upon the part of Storey County, to be about a mile to the east of the Reed's Station claimed by Storey County. A certified copy of the township plat of township 19 N, range 26 E, made in 1868, shows a Reed's Station near the Carson River in the northwest quarter of section 25 of the township. Without regard to whether as a matter of fact there was a Reed's Station at the point claimed by Storey County as early as 1861, we think the lower court was warranted in reaching the conclusion that the Reed's Station about eight miles east of the town of Dayton was the Reed's Station intended by the territorial legislature and mentioned in section 5 of the act of 1861, *supra.* By a reference to any government map, it will appear that the Reed's Station claimed by Storey County to be the one designated in the act of 1861 is located about six or eight miles south of the town of Hazen in Churchill County; and, if this be true, the legislature has been laboring under a misapprehension for many years, for, if the contention of Storey County is correct, not only the land claimed by Lyon County, but a portion of Churchill County within its recognized boundaries, would also be within the confines of Storey County.

On April 9, 1904, the clerk of the board of county commissioners of Storey County, under the seal of the county, directed a letter to the clerk of the board of county commissioners of Lyon County, as follows: "At a meeting of the board of county commissioners of Storey County, Nevada, held this day to consider the necessity of surveying the boundary line between Storey and Lyon County, it was moved and adopted by the said board that the deputy county surveyor, W. T. Moran, be

appointed to make the survey for Storey County and to meet the surveyor of Lyon County at Reed's Station, on Monday, the 25th day of April, 1904, or at such other date, after April 25, 1904, as shall be agreeable to the commissioners of Lyon County, Nevada, and at that date to commence the survey of the boundary line between Storey and Lyon County." It appears from the record that upon the 25th day of April, 1904, Thomas P. Mack, county surveyor of Lyon County, and W. T. Moran, deputy county surveyor of Storey County, met at Reed's Station upon the Carson River, eight miles below Dayton, in pursuance of directions of the respective boards of county commissioners of the two counties, for the purpose of making a joint survey of the eastern boundary line of Storey County. They proceeded to locate a point one mile below Reed's Station as claimed by Lyon County, and thereafter proceeded to locate a point three miles due north thereof. Before this point was definitely located Mr. Moran and his assistants returned to Storey County.

Upon the following day Mr. Mack and his assistants located a point three miles due north of a point on Carson River, one mile east of the said Reed's Station. At this point Mr. Mack made a search in the vicinity for an old corner monument, and found the same about one-half mile north of a little east of where he had determined the point to be, three miles from the Carson River. This latter monument consisted of a pile of stones four feet across the base and about two and one-half feet high, with a round post therein, pared off on three sides of the top. The northwest side of this post was marked "Storey"; the southwest side "Lyon." This old monument being so far from the point where Mr. Mack had located the true corner to be, he ran another line for the purpose of verification, and finally located a point as the true southeast corner of Storey County, and marked the same accordingly. From this corner monument he ran a line north twenty-seven degrees forty-five minutes east to a point on the old immigrant road leading from the sink of the Humboldt to the lower crossing of the Truckee River,

717 feet east of said crossing, where he erected a monument, marking the same with the word "Lyon" on the east side, "Storey" on the west, and "Washoe" on the north. Mr. Mack prepared a map of this survey, which, together with the copies of his field notes, was filed with the authorities of Lyon County and copies thereof were introduced in evidence in this case.

It is not seriously contended that this survey is incorrect, provided the assumed starting point was in accordance with the provisions of the statute of 1861—in other words, whether the Reed's Station assumed as the initial point for the commencement of the survey was the Reed's Station mentioned in the statute. We think this survey ought to be considered binding, unless the surveyors erred in making the survey with reference to the Reed's Station on the Carson River below Dayton. This survey appears to have been made in accordance with the provisions of an act entitled "An act authorizing the survey and establishment of boundaries between the several counties in this state," approved February 26, 1866 (Stats. 1866, p. 130).

It is contended by counsel for appellant that this statute can have no effect, because by the provisions of section 1 thereof such surveys are required to be "commenced within six months after the passage of this act." Provisions of this kind are often construed to be only directory, and we think they should be so construed in this case, especially in view of the provisions of section 7 of the act, which provides that such surveys may be made when a county line "is now, or may hereafter be, in dispute." Counsel for Lyon County offered in evidence the report of the survey made by George Hunt, county surveyor of Storey County, of date February 17, 1869, made to the board of county commissioners of Storey County. This report began as follows: "Having at your request established the boundary lines between the counties of Storey and Lyon and Storey and Washoe, I have the following to report." This report shows that County Surveyor Hunt began his survey at what he accepted as the

southeast corner stake of Storey County, being a point stated in his report "as established by John Astrom and John Day, in survey for the county of Lyon, said stake being marked 'Storey County' and 'Lyon County.'" From this point he ran a line due north to the Truckee River. A line run due north from a point one mile below Reed's Station, eight miles below Dayton, would, of necessity, intersect the Truckee River. This, as will hereafter appear, was doubtless due to the fact that at the time the act of 1861 was adopted there had been but few, if any, accurate surveys made of the territory, and it was not known with any degree of accuracy the exact direction and distances of points from each other. The statute of 1861 gave a due north course for the east side lines of Storey County, and this was the course followed by Hunt in his survey.

As natural monuments control directions, conceding that the Reed's Station nearest to Dayton was the one mentioned in the act of 1861, a line running from a point three miles north of and one mile below Reed's Station would necessarily have to be run in a northeasterly direction to intersect the old immigrant road east of the lower crossing of the Truckee River. The record also discloses that in 1869 there was a dispute or litigation pending between the counties of Washoe, Storey, and Lyon regarding a common corner near the town of Wadsworth, which town is located approximately at the lower crossing of the Truckee River. The county surveyor of Storey County at that time put in a claim against Lyon County for services rendered in locating this point. The Reed's Station now claimed by counsel for Storey County to be the one mentioned in the act of 1861, *supra,* was certainly not regarded by the authorities of Storey County as an initial point in 1869, when this controversy occurred; for, while a line run due north from a point one mile east of this other Reed's Station would strike the old immigrant road, it would be many miles east of the town of Wadsworth. It is clear from the testimony that no claim was ever made, prior to this action, that the Reed's Station now claimed by Storey County to be the one

mentioned in the act of 1861 was the one so designated. No map that has ever been prepared, so far as we are aware, was ever made with reference to this latter Reed's Station, and as we have before stated this Reed's Station is now shown to be within the boundaries of Churchill County as those boundaries are now established by act of the legislature.

Counsel for Storey County contends that what is known as De Groot's map of the Territory of Nevada, prepared in 1862 and published in 1863, and referred to in the territorial acts of 1864, *supra*, supports his contention that the Reed's Station located on the Carson River, near the 119th meridian, is the proper Reed's Station to be considered. We are unable to see that this De Groot's map supports the contention of counsel for Storey County. It is evident, upon a comparison of this map with later maps issued by the United States land office, that the same is very inaccurate. Herewith (see page 263) is a tracing of that portion of De Groot's map of the Territory of Nevada lying between the 119th and 120th meridians, and the 39th and 40th degrees of north latitude. Upon this tracing we have indicated by the dotted line the correct location of the Carson River as it appears upon the latest government maps, and by dots and figures is indicated the correct location of several places shown upon the De Groot map and including the correct locations of the two Reed's Stations.

The De Groot map shows places, rivers, and county boundaries to be off from their true location, distances varying from four to twenty miles. This is due doubtless to the fact that the De Groot map was made years before government surveys had definitely located points and distances. Making due allowances for the errors in the De Groot map, and it will appear that the southeast corner of Storey County as shown by that map is not far off from a point three miles north of a point on the Carson River about nine miles below Dayton (one mile below Reed's Station). If the other Reed's Station is considered, and allowance is made for the error in the map, the

Opinion of the Court—Norcross, J.

Tracing of Part of De Groot's Map of Nevada Territory (1862)

Dotted line refers to the correct location of Carson River according to U. S. surveys.

    1—Correct location of Reed's Station according to U. S. surveys.

    2—Correct location of Reed's Station according to U. S. surveys.

    3—Correct location of Dayton according to U. S. surveys.

    4—Correct location of Fort Churchill according to U. S. surveys.

    5—Correct location of Carson City according to U. S. surveys.

southeast corner of Storey County would appear to be about twenty miles distant. Whatever force the De Groot map has, we think it tends to support the contentions of counsel for Lyon County rather than for Storey County.

The judgment is affirmed.